## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ZACHARY MOHOLT, a minor, by his parents and
next friends,
Eric and Lisa Moholt,
8801 Goshen Mill Court,
Gaithersburg, Maryland 20882,

and

ERIC AND LISA MOHOLT,
8801 Goshen Mill Court,
Gaithersburg, Maryland 20882,

      Plaintiffs,

      v.

JERRY D. WEAST (officially as),   Superintendent,
Montgomery County Public Schools,
850 Hungerford Drive,
Rockville, MD 20850,

and

MONTGOMERY COUNTY BOARD OF
EDUCATION,
850 Hungerford Drive,
Rockville, MD 20850,

      Defendants.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.    This is a reimbursement action for costs incurred by plaintiffs Eric and Lisa

Moholt in educating their son Zachary Moholt in a private school for disabled children after

Montgomery County Public Schools ("MCPS" or "the school system") failed to provide Zachary

with a free appropriate public education ("FAPE") as required under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*.

## Jurisdiction

2.      This Court has jurisdiction over this matter pursuant to the IDEA, 20 U.S.C.

§§ 1400-1461; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; 42 U.S.C. §

1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343.  Declaratory relief is authorized by 28

U.S.C. §§ 2201 and 2202.  This court has pendent jurisdiction pursuant to MD. CODE ANN.

EDUC. § 8-401 *et seq*., (1996).  Plaintiffs have exhausted their administrative remedies and

appeal to this court from a decision of an Administrative Law Judge of the Maryland Office of

Administrative Hearings, MSDE-MONT-OT-04-32054 (September 23, 2004).  This decision,

hereinafter referred to as "Administrative Decision," is attached as Exhibit 1.

## Parties

3.      Zachary Moholt ("Zac") is a disabled student, eligible to receive special education

and related services, who at all times relevant to this action resided in Montgomery County,

Maryland.  His parents, Eric and Lisa Moholt ("the parents" or "the Moholts"), bring this action

on Zac's behalf and in their own right.

4.      Jerry D. Weast is the Superintendent of MCPS and, as such, is the public official

charged with the responsibility for ensuring that MCPS complies with federal law as to the

education of disabled children.  He is sued in his official capacity.

5.      The Montgomery County Board of Education is a local educational agency as

defined by 20 U.S.C. § 1401, and, as such, receives financial assistance from the United States

Department of Education.  The Montgomery County Board of Education is responsible for

2

complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County.

## **Factual Allegations**

6.    Zac Moholt has significant educational disabilities, including but not limited to dyslexia and occupational therapy needs.  These disabilities impact Zac's ability to succeed in school, and require that he receive special education and related services under the IDEA.

7.    Zac was born on May 15, 1996.

8.    Zac attended Kehilat Shalom nursery school from January 1999 through May 2001.  At this time, his nursery school teachers expressed numerous areas of concern with Zac's development, including his pencil grip, difficulty with scissors, writing, coloring, lack of consistent recognition of letters, and lack of understanding of simple directionalities such as "in front of" or "in back of."

9.    At the suggestion of Zac's nursery school teacher, the Moholts had an expert in special education, Mara Beier, observe Zac at Kehilat Shalom in April 2001.

10.    Due to the concerns regarding Zac's handwriting, the Moholts enrolled Zac in the Pencil Pals program, an occupational therapy-based program at the Treatment and Learning Center ("TLC"), for six weeks during the summer of 2001, before he entered kindergarten.  Ms. Moholt also worked with Zac at home with the Handwriting Without Tears program.

11.    The Moholts also arranged to have Dr. Jody Bleiberg from TLC conduct a psycho-educational evaluation of Zac in July 2001.

3

12.     In the fall of 2001, Zac started kindergarten at his neighborhood public school, Goshen Elementary School ("Goshen"). Zac attended Goshen for the 2001-02 and 2002-03 school years.

13.     The Moholts informed Zac's kindergarten teacher, Gayle Luckenbaugh, of their concerns regarding Zac early in the 2001-2002 school year, and provided her with Dr. Bleiberg's evaluation and the Pencil Pals progress report.

14.     Zac struggled throughout his kindergarten year at Goshen. He had difficulties with reading and writing, and frequently exercised school avoidance techniques. These caused him to suffer from decreased motivation and confidence.

15.     The Moholts originally enrolled Zac in extended-day kindergarten, but abandoned that plan when it became clear that he was unable to attend school for an extended period of time.

16.     Ms. Moholt regularly volunteered in Zac's classroom and witnessed his difficulties firsthand. On three or four occasions during his kindergarten year, she requested that MCPS evaluate Zac for learning disabilities.

17.     Ms. Luckenbaugh repeatedly advised Ms. Moholt that she did not believe that Zac should be tested for learning disabilities, and that he could grow out of his learning delays.

18.     Throughout his kindergarten and first grade year, the Moholts, at their own expense, provided Zac with one hour per week of occupational therapy at TLC to address his difficulties with fine motor skills.

19.     Over the summer of 2002, Zac continued his occupational therapy at TLC and also completed another summer of Pencil Pals.

4

20.     In September 2002, the Moholts again provided MCPS with copies of Zac's private evaluations, presenting them to Zac's first grade teacher, Bennell Mosby.

21.     At a parent/teacher conference in October 2002, the Moholts advised Ms. Mosby that TLC would be conducting another comprehensive psycho-educational evaluation of Zac.

22.     At the same conference, the Moholts requested that MCPS convene an IEP meeting to address Zac's difficulties. Ms. Mosby informed the Moholts that she did not believe that an IEP meeting was necessary.

23.     Zac continued to struggle throughout his first grade year at Goshen. His parents noted that he became withdrawn and angry. He was extremely resistant to attending school or completing homework. He struggled with academics and began referring to himself as "stupid."

24.     On October 16, 18, and 23, 2002, TLC evaluators Dr. Lisa Meier and Judy Miller, M. Ed., conducted a psycho-educational assessment of Zac. Dr. Meier and Ms. Miller found that Zac had average intellectual ability, that his reading and Broad Written Language skills were in the "Low Average" range, and that his Broad Math skills were in the "Borderline" range. This assessment revealed that Zac's reading and written language skills had not advanced from the levels he had exhibited in his previous testing, prior to entering kindergarten.

25.     Dr. Meier and Ms. Miller found that Zac's behaviors were consistent with anxiety and depression, and that he had significant difficulties with school concentration. They opined that he "had a very hard time maintaining attention even in a one-to-one situation" and that "he was in constant motion," but they did not believe that Zac met the criteria for Attention-Deficit/Hyperactivity Disorder ("ADHD"), since much of the behavior was related to avoidance.

26.     On Zac's first-quarter report card, he received the mark Needs Improvement ("N")
in Reading, Writing, Handwriting, and Mathematics. He also received an N in nine out of twelve
Work Study Skills categories.

26.     Zac's continuing difficulties prompted the Moholts to hire a tutor at their own
expense, to assist him with his problems at school.

27.     In November 2002, the Moholts again asked Ms. Mosby about the school system
convening an IEP meeting for Zac. Ms. Mosby again replied that she did not think that an IEP
team's consideration was necessary, as she had studied special education and would already be
providing Zac with any supports that an IEP team might recommend.

28.     Following this conversation, Ms. Moholt called MCPS to report Goshen's
unresponsiveness to her repeated requests for an IEP meeting. She was advised to request an IEP
meeting in a letter to the Goshen principal, Linda King.

29.     In a telephone conversation the following week, Ms. Moholt informed Ms. King
that they were awaiting formal evaluation results from TLC.

30.     On November 14, 2002, Ms. Moholt hand-delivered to Ms. King a letter
requesting an IEP meeting.

31.     Recognizing that Zac required more intensive support than Goshen could provide,
the Moholts began to explore alternative full-time educational placements for the 2003-04 school
year, including the Lab School of Washington ("Lab School"). They asked Ms. Mosby to
complete some forms assessing Zac's progress and needs, to include with any school
applications. Ms. Mosby completed these forms on November 18, 2002.

6

32.     During the Fall of 2002, the Moholts submitted an application to Lab School, as well as to other private schools that offered special education programs.

33.     Prior to Thanksgiving break, the Moholts received the written psycho-educational evaluation from TLC. On that same day, Ms. Moholt hand-delivered the evaluation to Ms. King and Ms. Mosby.

34.     On December 12, 2002, MCPS resource teacher Jane Storm observed Zac and reported, "Z[ac] had a very hard time maintaining attention to me even 1-1. I need [sic] to turn his face to me on 2 ocassions [sic] in three minutes. He lost focus between each question."

35.     MCPS convened an educational screening meeting on December 16, 2002. At the Moholts' request and expense, Dr. Meier attended the meeting to present her concerns about Zac. MCPS staff agreed to review the evaluations that the Moholts had presented.

36.     At the screening meeting Dr. Meier requested that Zac receive speech/language services as part of a comprehensive IEP. The MCPS speech/language pathologist stated that Zac did not have any articulation problems and that MCPS therefore would not evaluate his eligibility for speech/language services.

37.     The notes from the screening meeting state that Zac's "progress has been very slow," and note his memory problems, avoidance behaviors, and occupational therapy issues.

38.     In a letter dated December 31, 2002, Ms. Moholt advised Matt Kaymins of MCPS of her family's struggle to obtain IDEA services for Zac.

39.     MCPS Resource Specialist Linda Starling reviewed Dr. Meier's and Ms. Miller's evaluation. In a written report dated January 15, 2003, Ms. Starling concurred that Zac's written

7

expression skills were "significantly below age/grade expectancy," and corroborated the findings of the TLC report.

40.    MCPS School Psychologist Stephanie Livesay reviewed Dr. Meier's and Ms. Miller's evaluation. In a written report dated January 27, 2003, Ms. Livesay reported that "Zak [sic] is going to need considerable help to change his view of the school and of himself as a learner."

41.    On February 10, 2003, the IEP team reconvened and determined that Zac was eligible to receive special education services under the IDEA as a student with a Specific Learning Disability. The team proposed that Zac receive special education resource services for three hours each week, or ten percent of his school week.

42.    Despite Zac's documented need for occupational therapy, as of February 10, 2003, MCPS had not yet conducted a review of the occupational therapy reports that the Moholts had provided.

43.    At the Moholts' request and expense, Phyllis Castle, an educational consultant, attended the IEP meeting on February 10, 2003. At this meeting, Ms. Castle repeated the previous request that the IEP team consider providing Zac with speech/language therapy. MCPS again denied this request.

44.    The Moholts and Ms. Castle stated at the meeting that they believed that Zac required more than the three hours of special education services called for on the MCPS IEP. MCPS declined to increase the amount of service.

45.    Although the Moholts believed that Zac required more services than proposed by MCPS, they signed the proposed IEP because they were informed that MCPS would be unable to

8

implement *any* services for Zac without their signature. The Moholts accepted the IEP because they believed that this was the most special education that MCPS would offer Zac.

46.    Upon information and belief, other members of the IEP team expressed the belief that Zac's educational needs had not been adequately addressed at the February 2002 IEP meeting.

47.    On March 1, 2003, the resource teacher called Ms. Moholt to inform her that she had first met with Zac on February 27, 2003, for approximately forty-five minutes and that she intended to meet with him again on March 3, 2003.

48.    On March 12, 2003 and again on April 1, 2003, Zac was sent to the assistant principal's office because of his disruptive behavior in the classroom.

49.    Throughout the 2002-03 school year, Zac continued to be oppositional to attending school and continued to experience difficulties in academics, particularly in reading. Ms. Moholt expressed to the staff at Goshen her concerns regarding Zac's continued lack of progress.

50.    In mid- to late-March, Ms. Moholt called Ms. King to express concerns that Zac was not receiving the special education services called for in his IEP, and that MCPS had still not reviewed Zac's need for occupational therapy.

51.    On March 20, 2003, MCPS Occupational Therapist Tamar Auerbach finally reviewed the four private occupational therapy reports and evaluations provided by the Moholts.

52.    On March 31, 2003, Ms. Auerbach reportedly observed Zac in his classroom. In her written report of the observation, she noted that Zac fidgeted with his shoe laces during story

9

time. However, at this time Zac only wore shoes with velcro closures because he could not tie his shoes.

53.     On May 5, 2003, the IEP team reconvened to determine Zac's eligibility for occupational therapy, and recommended that he receive thirty minutes of occupational therapy services per week.

54.     The May 5, 2003 IEP team also agreed to increase Zac's special education services to five hours per week, of which thirty minutes were allotted to occupational therapy.

55.     At the meeting, the Moholts voiced their concerns about Zac's continued academic difficulties and oppositional behavior. They asked whether Zac could be considered for a more comprehensive program such as a Learning and Academic Disabilities ("LAD") program. The IEP team informed the Moholts that Zac would not qualify for the LAD program.

56.     On his fourth-quarter report card, Zac still received a mark of Needs Improvement ("N") in twelve categories.

57.     Despite the increase in Zac's special education services, he continued to call himself "stupid" and declare that he hated school. At the end of first grade, Zac's writing remained illegible and he could not read beyond basic sight words. He complained of frequent stomachaches and would often come home from school depressed or angry. In several instances, he acted out in class.

58.     On June 4, 2003, the IEP team again convened to address Zac's special education program. At this meeting, the Moholts repeated their concerns about Zac's behavioral and academic difficulties and again requested that Zac be considered for an LAD program. The

10

MCPS staff again informed the Moholts that Zac did not meet the qualifications for the LAD program.

59.     Due to Zac's continued difficulties, the Moholts arranged for Zac to participate in a summer program at Lab School at personal expense. At that time, Zac was on the waiting list for a space at Lab School for the 2003-04 academic year.

60.     Zac was successful during his summer program at Lab School.   His reading improved and he started to demonstrate more self-confidence. At the end of the summer, Zac approached Neela Seldin, the head of the Lower School at Lab, and told her that he needed to come to Lab because he felt comfortable in the learning environment there.

61.     Due to Zac's performance during the summer program and the staff's observation of his significant needs, Lab School agreed to move Zac to the top of their lengthy waiting list.

62.     Because the Moholts did not have an alternative placement for Zac, on August 26, 2003, Zac returned to Goshen for the 2003-04 school year.

63.     On August 27, 2003, Lab School called the Moholts to inform them that Zac had been accepted into their program.

64.     On August 28, 2003, Ms. Moholt hand-delivered a letter to Ms. King informing her of Zac's recent acceptance to Lab School. This letter advised that the Moholts' concern about Zac's lack of progress, anxiety and depression had prompted them to place him at Lab.

65.     Ms. Moholt also called Ms. Storm to advise her that Zac would be attending Lab for the 2003-04 school year. At this time, Ms. Storm informed Ms. Moholt that "there would be a problem" if she attempted to seek funding for Lab School from MCPS.

66.     Zac continued to attend Goshen until Friday, September 5, 2003.

67.     On Monday, September 8, 2003, Zac began attending Lab School on the first day of Lab's academic year.

68.     After exhausting any informal avenues for resolving their differences with defendants, the parents submitted a request for a due process hearing on June 18, 2004, alleging that MCPS had failed to properly identify Zac's needs and offer him appropriate special education services in accordance with the IDEA.  The Moholts sought reimbursement for Zac's placement at Lab School for the 2003-04 school year.

69.     A Due Process Hearing convened on July 19, 2004, before ALJ Marleen B. Miller, and continued on August 3 and 23, 2004.

70.     The ALJ heard testimony and received written exhibits on the substantive issues of Zac's case: the appropriateness of the proposed placement, and the school system's failure to provide him with a FAPE.

71.     In a decision dated September 23, 2004, the ALJ determined that Zac continues to be eligible for special education services, but also found that the Moholts were not entitled to placement and funding for Zac at Lab School, based on her finding that MCPS offered a program calculated to provide him with educational benefit.

72.     The ALJ's September 23, 2004, decision contains palpable errors of fact and law.

73.     The IEP that MCPS proposed for the 2003-04 school year was not appropriate for Zac.

74.     The proposed placement at Goshen for the 2003-04 school year could not appropriately meet Zac's needs.

12

75.     The ALJ erred by finding that the Moholts had agreed that the IEP MCPS proposed for Zac for the 2003-04 school year was sufficient to meet Zac's complex needs.

76.     Catherine Hostetler, Donna Pavluk, Sandra Kaspar, and Karen Duncan testified at the hearing and all provided compelling expert testimony that Zac could not succeed in a part-time special education program.

77.     Ms. Hostetler provided compelling expert testimony regarding Zac's need for occupational therapy services as part of his special education program.

78.     Ms. Pavluk provided compelling expert testimony regarding Zac's need for speech/language therapy services as part of his special education program.

79.     Dr. Kaspar provided compelling testimony regarding Zac's need for psychological/counseling services as part of his special education program.

80.     Ms. Duncan provided compelling testimony regarding the severity of Zac's educational disabilities and his need for a full-time special education day program.

81.     The ALJ ignored the testimony of the Moholts' expert witnesses.

82.     The ALJ erred by ignoring the compelling testimony regarding Zac's anxiety and depression resulting from his academic failures at Goshen.

83.     The ALJ erred by ignoring the compelling evidence that Zac's disabilities required occupational therapy services to be integrated as part of his IEP, and by failing to consider MCPS' failure to timely provide Zac with occupational therapy services during the 2002-03 school year.

84.     The ALJ erred by ignoring the compelling evidence that Zac's disabilities required speech/language services to be integrated as part of his IEP.

13

85.     The ALJ erred by finding that the Moholts did not provide timely notice to MCPS of their intent to enroll Zac at the Lab School, as the Moholts notified MCPS immediately after learning that Zac had been accepted to Lab.

86.     The ALJ erred by instructing the school system's counsel with respect to the arguments that she would find convincing on the issue of notice.

87.     The ALJ erred by speculating and making assumptions regarding the parents' intent in participating in the IEP process and enrolling their son at Lab, without any evidence in the record.

88.     The ALJ erred by finding, in contradiction to Ms. Moholt's testimony, that the parents believed that Zac's attitude toward school was improving and that he had made progress in academics.

89.     The ALJ erred by finding that the Moholts did not express their dissatisfaction with the level of services proposed by MCPS.

90.     The ALJ erred by ignoring the clear evidence that MCPS continually ignored the Moholts' repeated requests for additional IDEA services for Zac.

91.     The ALJ erred by ignoring the compelling evidence that Zac failed to make appropriate academic progress at Goshen, and offered no explanation for giving weight to the MCPS witnesses' general and often conflicting statements regarding Zac's academic progress.

92.     Without cause or valid explanation, the ALJ improperly disregarded the compelling evidence that MCPS failed to recognize the severity of Zac's learning disabilities.

93.     Without cause or valid explanation, the ALJ improperly disregarded the

14

overwhelming testimony of the parents' experts regarding the inappropriateness of the level of services that MCPS proposed for Zac.

94. Without cause or valid explanation, the ALJ improperly disregarded the compelling evidence that Zac requires a full-time special education day program.

95. The ALJ misinterpreted and misapplied federal and Maryland statutory and case law in her decision.

96. The ALJ abused her discretion by failing to award reimbursement to the Moholts, when no binding legal authority barred her from doing so.

97. Plaintiffs are aggrieved by the decision of the ALJ.

98. Plaintiffs have exhausted their administrative remedies.

## COUNT I

99. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 98.

100. Defendants' failure to provide Zachary Moholt with a free appropriate public education violates plaintiffs' rights under the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT II

101. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 100.

102. The failure of the ALJ to order defendants to place and fund Zachary Moholt in an appropriate program violates the IDEA and Maryland Law.

## COUNT III

103.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 102.

104.    The Hearing Officer committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law by failing to consider relevant, probative and admissible evidence and testimony offered by the parents.

## COUNT IV

105.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 104.

106.    The failure of defendants to provide plaintiffs with adequate due process procedures violates the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT V

107.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 106.

108.    The Hearing Officer committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to render a proper decision on all substantive issues presented by the plaintiffs.

16

WHEREFORE, plaintiffs respectfully request that this Court:

1.  Issue judgment for plaintiffs and against defendants;
2.  Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;
3.  Issue injunctive relief ordering defendants to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling Zachary Moholt at the Lab School of Washington for the 2003-04 school year, while declaring Lab School to be Zachary's current educational placement under the IDEA.
4.  Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and
5.  Award any other relief that this Court deems just.

Respectfully Submitted,

Michael J. Eig /hmi

Michael J. Eig          #07718

Haylie M. Iseman          #14782

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs

17